JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| SANDRA MEDINA, individually and on behalf of herself and all others similarly situated,<br><br>            Plaintiff,<br><br>    v.<br><br>EVOLVE MORTGAGE SERVICES, LLC,<br><br>            Defendant. | Case No.: SACV 21-01338-CJC (JDEx)<br><br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR FINAL APPROVAL OF FLSA COLLECTIVE ACTION AND PAGA REPRESENTATIVE ACTION SETTLEMENT [Dkt. 37]** |

## I.    INTRODUCTION

Plaintiff Sandra Medina brings this collective action against her former employer, Defendant Evolve Mortgage Services, LLC.  (*See* Dkt. 19 [First Amended Complaint, hereinafter "FAC"].)  Defendant is "a full-service, onshore provider of outsourced mortgage services and technologies."  (*Id.* ¶ 7.)  Plaintiff worked for Defendant as a mortgage underwriter from approximately August 2020 until February 2021.  (*See id.*

¶ 6.)  She brings seven claims against Defendant, including (1) failure to pay overtime wages in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. Section 201, (2) failure to pay overtime wages, Cal. Lab. Code Sections 510, 1194, and 1998, (3) failure to pay proper meal period premiums, Cal. Lab. Code Sections 226.7 and 512, (4) failure to provide itemized wage statements, Cal. Lab. Code Section 226(a), (5) failure to pay earned and unpaid wages within 30 days of discharge, Cal. Lab. Code Sections 201–203, (6) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code Section 17200, and (7) civil penalties pursuant to the Private Attorney General Act ("PAGA"), Cal. Lab. Code Section 2698.  (*Id.* at 1–2.)

Plaintiff initially filed a motion for conditional class and collective certification and preliminary settlement approval on August 29, 2022.  (*See* Dkt. 27 [Notice of Motion and Motion for Settlement Approval of Class and Collective Settlement – Preliminary].)  At that time, the proposed settlement agreement contained both an "FLSA Collective" and a Rule 23 class of California employees.  (*See id.*)  The Court denied Plaintiff's motion without prejudice, in part due to issues with the putative class lacking numerosity and the potential for opt-out class members to improperly release their FLSA claims.  (*See* Dkt. 29 at 3–5, 7–8.)  To address the Court's concerns with the initial motion for preliminary settlement approval, the parties re-structured the settlement to remove the class component, such that the agreement contained only an opt-in FLSA Collective.  (*See* Dkt. 32 [Notice of Motion and Motion for Settlement Approval of Class and Collective Settlement].)  The Court granted preliminary approval of the settlement.  (*See* Dkt. 33.)

Now before the Court is Plaintiff's motion for final settlement approval.  (*See* Dkt. 37 [Notice of Motion and Motion for Settlement Approval of FLSA Collective Action Settlement – Final, hereinafter "Mot."].)  For the following reasons, Plaintiff's motion is **GRANTED**.

## II.    BACKGROUND

The FLSA Collective is made up of approximately 218 underwriters who worked for Defendant as non-exempt employees eligible for commission or other non-discretionary incentive pay, and who were paid overtime and non-discretionary incentive pay in the same pay period at least once between August 13, 2018, and December 31, 2021.  (*See* Mot. at 1–3.)  Defendant paid Plaintiff and the Collective Members "a per file production payment using a points-based schedule (e.g., $55 per file for the first 5 files completed per day and $75 per file for additional files completed in a day)" and "extracted Plaintiff's $13.00 hourly rate payment from the production payment, and paid the rest of the production payment as commission earnings."  (FAC ¶ 12.)

Under the FLSA and California law, covered employers must compensate all non-exempt employees at a rate of not less than 1.5 times their "regular rate of pay" for overtime work.  (*Id.* ¶ 13.)  According to Plaintiff, an employee's "regular rate" includes both the employee's hourly rate as well as any non-discretionary incentive compensation, such as commission payments.  (*Id.* ¶ 14.)  Plaintiff alleges that Defendant's overtime payments to Plaintiff and the FLSA Collective were based only on the hourly rate, without considering non-discretionary incentive pay.  (*Id.* ¶ 17.)  As a result, Plaintiff and the FLSA Collective did not receive proper overtime pay.  (*Id.*)  Plaintiff alleges that the same calculation error was made in determining payments for missed meal periods.  (*Id.* ¶ 19.)  Due to these errors, Plaintiff alleges that the wage statements furnished by Defendant were inaccurate.  (*Id.* ¶ 23.)  Plaintiff further alleges that Defendant "failed to pay all wages that were due" within thirty days of the termination of employment, "including legally required overtime and meal period premiums at the appropriate rate."  (*Id.* ¶ 24.)  Finally, Plaintiff alleges that Defendant did this knowingly, intentionally, and in bad faith.  (*Id.* ¶ 26.)

After engaging in two lengthy mediation sessions, the parties entered into a settlement agreement (the "Settlement Agreement").  (*See* Dkt. 32-2, Ex. A [Settlement Agreement, hereinafter "SA"].)  Under the Settlement Agreement, Defendant would pay up to $575,000.00 allocated as follows:  (1) an FLSA Settlement Fund with a maximum value of $383,750 to pay claims for all FLSA Collective Members who submit timely and valid opt-in claim forms, (2) a PAGA payment of $4,000, with $3,000 to be distributed to California's Labor Workforce Development Agency ("LWDA") and $1,000 to remain part of the settlement for distribution to eligible Collective Members, (3) administration costs, not to exceed $16,500, (4) litigation costs, not to exceed $9,500, (5) attorneys' fees equivalent to 25% of the amount that is ultimately paid out by Defendant, not to exceed $143,750, and (6) an incentive award of $7,500 to Plaintiff. Individuals who opted in would "receive approximately 105% of their lost wages"— the equivalent of "100% of the overtime wages allegedly due plus 5% for liquidated damages."  (*See* Dkt. 27 [Notice of Motion and Motion for Settlement Approval of Class and Collective Settlement – Preliminary] at 3.)  Of the twenty-one FLSA Collective Members who worked in California, (*see* Dkt. 37-1 [Declaration of Daniel S. Brome, hereinafter "Brome Decl."] ¶ 11), those who participate in the settlement will receive additional compensation for the California state law claims, specifically the claims for missed meal period payments, wage statement penalties, waiting time penalties, and PAGA penalties.  (*See* SA ¶ 47(d).)

The Court's preliminarily approval order directed Plaintiffs to disseminate notice of the settlement and a consent/claim form to the Collective Members.  Defendant provided CPT Group, the third-party settlement administrator, with a complete mailing list which included each individual's full name, most recent mailing address, Social Security Number, and estimated share of the settlement.  (*See* Dkt. 37-3 [Declaration of Irvin Garcia, hereinafter "Garcia Decl."] ¶ 3.)  The mailing addresses provided by Defendant were processed and updated by CPT utilizing the National Change of Address

Database maintained by the U.S. Postal Service.  (*Id.* ¶ 4.)  On December 12, 2022, Settlement Notices were mailed to the 218 Collective Members identified by Defendant via First Class mail.  (*Id.*)  Eight of the notices were returned by the post office. (*Id.* ¶ 5.)  CPT performed skip traces to locate new mailing addresses for those individuals, and seven of the notices were ultimately re-mailed after an alternate mailing address was found.  (*Id.*)  To date, only two notices are considered undeliverable.  (*Id.*)

On January 23, 2023, claims had plateaued at less than one third of the net settlement amount ("NSA"), i.e., the total amount initially available for distribution to claimants, equal to $383,750.00.  (*See* Mot. at 2.)  Plaintiff filed an ex parte application for permission to send a supplemental reminder notice to the Collective Members, which the Court approved.  (*See* Dkts. 34, 36.)  After the supplemental notice was mailed, twenty-four more individuals came forward and claimed 43% of the NSA.  (*See* Brome Decl. ¶ 12; Mot. at 2.)

At the conclusion of the extended Notice Period, CPT had received valid claims from 111 individuals (50.9% the putative Collective Members), totaling $291,325.06. (*See* Garcia Dec. ¶¶ 8, 12.)  None of the Collective Members submitted objections or otherwise disputed the settlement.  (*See id.* ¶¶ 9–10.) The amount Defendant will pay out is now estimated to be $482,575.06, comprised of (1) attorneys' fees of $117,783.71, (2) litigation costs of $9,500.00, (3) a service award of $7,500, (4) a PAGA Fund of $4,000.00, (5) settlement administration costs of $16,500, and (6) $317,291.35 distributed to the Claimants.[1]  (*See* Mot. at 6, 10, 13; Garcia Decl. ¶ 15.)

---

[1]  Initially, Plaintiff's counsel requested attorneys' fees equivalent to 25% of the amount ultimately paid out by Defendant, not to exceed $143,750.  Based on the amount of the settlement fund that was claimed after notice was distributed, the requested attorneys' fees were reduced from $143,750.00 to $109,128.28.  (*See* Brome Decl. ¶ 13.)  "The difference—$34,621.72—was allocated 25% to attorneys' fees, and 75% to Claimants.  As a result, $25,966.29 was reallocated to the Claimants." (*Id.*)  Thus, while the claims only totaled $291,325.06, after the reallocation, $317,291.35 will be distributed to the Claimants.

## III.   FLSA COLLECTIVE CERTIFICATION

The FLSA was enacted to protect workers from substandard wages and oppressive working hours.  *See Barrentine v. Arkansas–Best Freight System*, 450 U.S. 728, 739 (1981).  Under the FLSA, "one or more employees" may file a civil action—termed a collective action—"in behalf of himself or themselves and other employees similarly situated."  29 U.S.C. § 216(b).  Unlike a class action under Rule 23, to participate in a collective action, an employee is required to give consent in writing.  *See* 29 U.S.C. § 216(b); *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989) (explaining that rights in a collective action under the FLSA are dependent on the employee receiving accurate and timely notice about the pendency of the collective action, so that the employee can make informed decisions about whether to participate).  "If an employee does not file a written consent, then that employee is not bound by the outcome of the collective action."  *Edwards v. City of Long Beach*, 467 F. Supp. 2d 986, 989 (C.D. Cal. 2006).

"When the parties seek settlement approval of an FLSA collective action claim before seeking certification of a collective action, courts in this circuit first consider whether certification is appropriate and then whether the proposed settlement is substantively acceptable."  *Kempen v. Matheson Tri-Gas, Inc.*, 2016 WL 4073336, at *4 (N.D. Cal. Aug. 1, 2016).  In *Campbell v. City of Los Angeles*, 903 F.3d 1090 (9th Cir. 2018), the Ninth Circuit specified a two-step approach for determining whether an FLSA collective action should be certified.  The first step requires the Court to "make an initial 'notice-stage' determination of whether potential opt-in plaintiffs are 'similarly situated' to the represented plaintiffs."  *Id.* at 1110.  Although the FLSA does not define the term "similarly situated," the Ninth Circuit has stated that "[p]arty plaintiffs are similarly situated, and may proceed in a collective, to the extent they share a similar issue of law or fact material to the disposition of their FLSA claims."  *Id.* at 1117.  After the collective

has received notice and discovery has been concluded, the second step allows employers

to move for decertification by showing that the collective members are not similarly

situated.  *See Syed v. M–I, L.L.C.*, 2014 WL 6685966, at *2 (E.D. Cal. Nov. 26, 2014).

At that point, the court "engages in a more stringent inquiry into the propriety and scope

of the collective action." *Labrie v. UPS Supply Chain Solutions, Inc.*, 2009 WL 723559,

at *4 (N.D. Cal. Mar. 18, 2009).  But "[a]bsent an argument that the parties are

not similarly situated, this Court need not look to the second step at all." *Millan v.

Cascade Water Servs., Inc.*, 310 F.R.D. 593, 607 (E.D. Cal. 2015)

At the preliminary approval stage, the Court found that the Collective Members

were similarly situated and conditionally certified the Collective under the first step of

the *Campbell* analysis.  (*See* Dkt. 33 at 7.)  All members of the proposed Collective

performed similar work for Defendant under similar conditions, were all employed by

Defendant as mortgage underwriters, and were all subject to Defendant's alleged pattern,

practice, and policy of failing to include non-discretionary incentive payment in

overtime and meal period premium payments.  (*See* Dkt. 32 [Renewed Notice of Motion

and Motion for Settlement Approval of FLSA Collective Action Settlement –

Preliminary] at 8.)

The Collective has now received notice and discovery has concluded, and thus the

Court turns to the second step of the *Campbell* analysis.  But Defendant has not filed a

motion to decertify or otherwise opposed collective action treatment of Plaintiff's FLSA

claims for the purpose of settlement.  Accordingly, final certification of the FLSA

Collective is warranted.

//

//

//

//

## IV.    FLSA COLLECTIVE ACTION SETTLEMENT

Employees may not settle and release FLSA claims against an employer without obtaining the approval of either the Secretary of Labor or a district court.  *See Seminiano v. Xyris Enter., Inc.*, 602 F. App'x 682, 683 (9th Cir. 2015); 29 U.S.C. §§ 216(b), (c). The Ninth Circuit has not set forth specific criteria for courts to consider when evaluating an FLSA settlement.  As a result, district courts in the Ninth Circuit frequently rely on the Eleventh Circuit's standard in *Lynn's Food Stores v. United States*, 679 F.2d 1350 (11th Cir. 1982).  *See, e.g.*, *McClure v. Waveland Servs., Inc.*, 2021 WL 5204151, at *2 (E.D. Cal. Nov. 9, 2021); *Hernandez v. Dutton Ranch Corp.*, 2021 WL 5053476, at *3 (N.D. Cal. Sept. 10, 2021); *Pike v. Cty. of San Bernardino*, 2019 WL 8138439, at *2 (C.D. Cal. Nov. 25, 2019); *Dunn v. Teachers Ins. & Annuity Ass'n of Am.*, 2016 WL 153266, at *3 (N.D. Cal. Jan. 13, 2016).  Under that standard, a court may not approve an FLSA settlement unless (1) the employee's claim involves a "bona fide dispute" over FLSA liability, and (2) the settlement is a "fair and reasonable" resolution of that dispute.  *Lynn's Food Stores*, 679 F.2d at 1353.

### A.    Bona Fide Dispute

"A bona fide dispute exists when there are legitimate questions about the existence and extent of the defendant's FLSA liability." *Jennings v. Open Door Mktg., LLC*, 2018 WL 4773057, at *4 (N.D. Cal. Oct. 3, 2018); *see also Kerzich v. Cty. of Tuolumne*, 335 F. Supp. 3d 1179, 1184 (E.D. Cal. 2018); *Selk v. Pioneers Mem'l Healthcare Dist.*, 159 F. Supp. 3d 1164, 1174 (S.D. Cal. 2016).  Plaintiff's claims involve a bona fide dispute over whether Defendant violated the FLSA by failing to provide full compensation for overtime hours and meal period premiums.  The parties have investigated Plaintiff's claims through informal discovery, informal disclosures between the parties, and other investigations undertaken by Plaintiff's Counsel.  (*See* SA ¶ 44.)  Defendant denies any

wrongdoing and maintains that it complied at all times with its obligations under state and federal laws.  (*See id.* ¶ 43.)  There are thus "legitimate questions about the existence and extent of [D]efendant's FLSA liability."  *Jennings*, 2018 WL 4773057, at *4.

### B.    Fair and Reasonable Resolution

The Court next considers whether the Settlement Agreement reflects a fair and reasonable resolution of the asserted claims.  In making this determination, courts "often apply factors for assessing a proposed class action settlement pursuant to Federal Rule of Civil Procedure 23," while "recogniz[ing] that some of the Rule 23 factors do not apply because of the inherent differences between class actions and FLSA actions."  *Dashiell v. Cty. of Riverside*, 2018 WL 3629915, at *2 (C.D. Cal. July 19, 2018).  Under Federal Rule of Civil Procedure 23(e)(2), a proposed settlement must be "fair, reasonable, and adequate."  In considering whether this standard is met, courts consider whether "(A) the class representatives and class counsel have adequately represented the class, (B) the proposal was negotiated at arm's length, (C) the relief provided for the class is adequate, and (D) the proposal treats class members equitably relative to each other."  Fed. R. Civ. P. 23(e)(2)(A–D).

But because relying only on the Rule 23 factors "runs the risk of not giving due weight to the policy purposes behind the FLSA," district courts in this circuit have "adopted a totality of circumstances approach that emphasizes the context of the case and the unique importance of the substantive labor rights involved."  *Selk*, 159 F. Supp. 3d at 1173.  This approach considers many of the factors relevant to Rule 23 class action settlements, "but adjusts or departs from those factors when necessary to account for the labor rights at issue."  *Id.*  The factors courts consider are (1) the plaintiff's range of possible recovery, (2) the stage of proceedings and amount of discovery completed, (3) the seriousness of the litigation risks faced by the parties, (4) the scope of any release

provision in the settlement agreement, (5) the experience and views of counsel and the opinion of participating plaintiffs, and (6) the possibility of fraud or collusion.  *See id.* Ultimately, the Court must be "satisfied that the settlement's overall effect is to vindicate, rather than frustrate, the purposes of the FLSA."  *Kerzich*, 335 F. Supp. 3d at 1185 (quoting *Selk*, 159 F. Supp. 3d at 1173).

### 1.    Range of Possible Recovery

"A district court evaluates the plaintiff's range of potential recovery to ensure that the settlement amount agreed to bears some reasonable relationship to the true settlement value of the claims."  *Selk*, 159 F. Supp. 3d at 1174.  "The settlement amount need not represent a specific percentage of the maximum possible recovery," but rather "in comparing the amount proposed in the settlement with the amount that plaintiffs could have obtained at trial, the court must be satisfied that the amount left on the settlement table is fair and reasonable under the circumstances presented."  *Id.*

The 111 Claimants collectively claimed $291,325.06, which is 75.92% of the amount made available to potential claimants under the Settlement Agreement ($383,750.00).  (*See* Brome Decl. ¶ 13.)  The maximum possible recovery for the 111 Claimants had the case gone to trial was approximately $682,000.  (*See* Mot. at 8.) Including the amount by which Counsel's requested fee request was reduced from preliminary to final approval, approximately $317,291.35 will be distributed to the Claimants, which amounts to 46.5% of their maximum possible recovery and 115% of their lost wages.  (*See id.* at 9; Brome Decl. ¶ 13.)  The average payment per person will be $2,858.48.  (*See* Brome Decl. ¶ 13.)  And "[o]n average, the 111 Claimants will receive $233.93 more than the amount reflected on their Notice."  (*Id.*)

//

//

The Court finds that the amount of the settlement as compared to the potential recovery weighs in favor of approving the settlement.  *See Monterrubio v. Best Buy Stores, L.P.,* 291 F.R.D. 443, 444 (E.D. Cal. 2013) (finding recovery of approximately 30% of estimated damages to favor settlement); *Khanna v. Intercon Sec. Sys., Inc.*, 2014 WL 1379861, at *8 (E.D. Cal. Apr. 8, 2014), *order corrected,* 2015 WL 925707 (E.D. Cal. Mar. 3, 2015) (finding reasonable 19% of the FLSA recovery including liquidated damages); *Bellinghausen v. Tractor Supply Co.,* 306 F.R.D. 245, 256 (N.D. Cal. 2015) (finding a wage and hour class settlement fair where the settlement fund represented between 9% and 27% of the total potential recovery); *Stovall-Gusman v. W.W. Granger, Inc.*, 2015 WL 3776765, at *4 (N.D. Cal. June 17, 2015) (finding reasonable a settlement "represent[ing] approximately 10% of what [the] class might have been awarded had they succeeded at trial"); *Ma v. Covidien Holding, Inc.*, 2014 WL 360196, at *5 (C.D. Cal. Jan. 31, 2014) (finding a settlement worth 9.1% of the total value of the action "within the range of reasonableness").

### 2.    Stage of Proceedings and Amount of Discovery Completed

Courts are "more likely to approve a settlement if most of the discovery is completed because it suggests that the parties arrived at a compromise based on a full understanding of the legal and factual issues surrounding the case."  *Adoma v. University of Phoenix, Inc.*, 913 F. Supp. 2d 964, 977 (E.D. Cal. 2012).  Here, Counsel conducted an extensive investigation into the facts of the case and the strength of the asserted claims, including through "informal discovery, informal disclosures between the Parties, and other investigations undertaken by counsel for Plaintiff."  (SA ¶ 44.)  The Parties also "engaged in extensive negotiations and exchange of data, documents, and information in connection with the mediation."  (*Id.*)  This weighs in favor of approval.

//

//

### 3.    Litigation Risks

"In most situations, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results." *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 526 (C.D. Cal. 2004) (quoting 3 Newberg on Class Actions § 11:50 (4th ed. 2012)).  In assessing the risk, expense, complexity, and likely duration of further litigation, courts should consider "the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation." *Id.* (quoting *Oppenlander v. Standard Oil Co. (Indiana)*, 64 F.R.D. 597, 624 (D. Colo. 1974)).

The seriousness of the litigation risks faced by the parties weighs in favor of approval.  Plaintiff has previously stated that "[s]ubstantial uncertainty remains as to whether the FLSA claims would receive conditional certification, how many underwriters would opt-in, and whether the FLSA claims would remain certified."  (Dkt. 32 [Renewed Notice of Motion and Motion for Preliminary Approval of FLSA Collective Action Settlement – Preliminary] at 11.)  Even if Plaintiff succeeded in obtaining certification and establishing liability, she would need to prove that Defendant's alleged violations were willful to obtain the maximum possible recovery.  (*Id.* at 12.)  Further, "Defendant indicated that it would challenge Plaintiff's damages calculations" because "its time records were not accurate and actually inflated the hours employees worked, based on Defendant's review of computer activity data which Defendant contends demonstrates that putative collective members actually worked fewer hours than they reported on their timecards."  (*Id.*)  While Plaintiff disputes the merits of this challenge, she recognizes that such a dispute would add uncertainty and delay to the litigation.  (*See id.*)

//

//

These facts indicate that "there is a significant risk that litigation might result in a lesser recovery for the [Collective] or no recovery at all." *Jennings*, 2018 WL 4773057, at *5 (internal citation omitted); *see Selk*, 159 F. Supp. 3d at 1175 (finding that this factor weighed in favor of approval when there was an argument that the defendant had not violated the FLSA and a "real possibility that Defendant would successfully decertify one or both of the classes"). Accordingly, this factor weighs in favor of approval.

### 4. Scope of Settlement Agreement's Release Provision

An FLSA release should not go beyond the specific FLSA claims at issue in the lawsuit itself. *See Slezak v. City of Palo Alto*, 2017 WL 2688224, at *4 (N.D. Cal. June 22, 2017). Indeed, courts "routinely reject FLSA settlements when the scope of the release goes beyond the overtime claims asserted in the complaint." *Dunn*, 2016 WL 153266, at *5. The goal is to "ensure that class members are not pressured into forfeiting claims, or waiving rights, unrelated to the litigation." *Selk*, 159 F. Supp. 3d at 1178.

The Settlement Agreement's release is limited to claims that could have been asserted in this case. Specifically, FLSA Collective Members agree to release claims that "may have [been] brought against the Released Parties based on the facts alleged in the Complaint and/or First Amended Complaint during the FLSA Collective Period for unpaid overtime in violation of the Fair Labor Standards Act, 29 U.S.C. section 201 *et seq*. and the corresponding Department of Labor Regulations, 29 C.F.R. section 785 *et seq*. and 778 *et seq*., including, but not limited to, any claims for unpaid wages, economic damages, liquidated damages, other monies, or other relief." (SA ¶ 18.) Members who worked in California will also release claims that "may have [been] brought against the Released Parties based on the facts alleged in the Complaint and/or First Amended Complaint during the California Period for unpaid overtime, meal period premiums, wage statement penalties, waiting time penalties, PAGA penalties, statutory liquidated

damages, and attorneys' fees and costs." (*Id.* ¶ 4.) The limited scope of the release provisions weighs in favor of approval.

### 5.    Counsel's Experience and Views

"In determining whether a settlement is fair and reasonable, the opinions of counsel should be given considerable weight both because of counsel's familiarity with the litigation and previous experience with cases." *Slezak*, 2017 WL 2688224, at *5 (cleaned up). "As the Ninth Circuit has emphasized, parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation." *Selk*, 159 F. Supp. 3d at 1176 (cleaned up).

Counsel has nearly three decades of experience advocating for employee and consumer rights and has represented "thousands of employees in hundreds of cases." (Dkt. 32-1 [Declaration of Daniel Brome] ¶ 6.) Counsel has also "concluded that the Settlement Agreement is fair, reasonable, and adequate and is in the best interest of the FLSA Collective in light of all known facts and circumstances, including the likely damages, risk of significant delay, risk that the Action would not proceed on a collective or class action basis, defenses asserted by Defendant, and numerous potential appellate issues." (SA ¶ 44.) This factor therefore weighs in favor of approval.

### 6.    Possibility of Fraud or Collusion

In assessing whether there is a possibility of fraud or collusion, courts often look to the considerations highlighted by the Ninth Circuit in *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011). *See Jennings*, 2018 WL 4773057, at *8; *Selk*, 159 F. Supp. 3d at 1180; *Slezak*, 2017 WL 2688224, at *5. In that case, the Ninth Circuit explained that courts "must be particularly vigilant not only for explicit collusion,

but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *Bluetooth*, 654 F.3d at 947; *see also Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1060 (9th Cir. 2019); *Briseno v. Henderson*, 998 F.3d 1014, 1023 (9th Cir. 2021). Those signs include (1) when counsel receives a disproportionate distribution of the settlement, (2) when the parties negotiate a "clear sailing arrangement," under which the defendant agrees not to challenge a request for an agreed-upon amount of attorneys' fees, and (3) when the agreement contains a "kicker" or "reverter" clause that returns unclaimed funds to the defendant rather than to the class. *Bluetooth*, 654 F.3d at 947; *see also Roes,* 944 F.3d at 1060; *Briseño*, 998 F.3d at 1023. But these are just signs of *possible* collusion, not automatic bases for rejection of a settlement. *See Briseño*, 998 F.3d at 1027. When they are present, courts must scrutinize the settlement more closely to look for signs that self-interest—even if not purposeful collusion—has seeped its way into the settlement terms. *See Roes,* 944 F.3d at 1060.

As discussed more fully below, Counsel does not receive a disproportionate distribution of the settlement. Nor are there any concerns about reverter, because unawarded fees go to the Collective Members, not Defendant. (*See* SA ¶ 47(h) ["Should the Fee and Expense Award approved by the Court be less than the amount sought, the difference shall be distributed, pro rata, prior to distribution of settlement funds to Claimants"].) Finally, the Settlement Agreement does not contain a clear sailing arrangement. The Court therefore finds no evidence that the Settlement Agreement resulted from, or was influenced by, fraud or collusion.

## C.    Attorneys' Fees

"Where a proposed settlement of FLSA claims includes the payment of attorney's fees, the court must also assess the reasonableness of the fee award." *Selk*, 159 F. Supp.

3d at 1180; *see also* 29 U.S.C. § 216(b) (providing that in a FLSA action, the court "shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action"). "The district court has discretion in common-fund cases to award attorneys' fees in the amount of a percentage of the common-fund or using the lodestar method." *Kakani v. Oracle Corp.*, 2007 WL 4570190, at *2 (N.D. Cal. Dec. 21, 2007).

Plaintiff's Counsel seeks approval of $117,783.71 in attorneys' fees. That amount was calculated by multiplying the initial attorneys' fee request of $143,750.00 "by the percentage of the net settlement amount that was claimed (75.92%). The difference between the initial and the reduced amount ($34,621.72) was then divided with 75% to Claimants, and 25% to fees." (Brome Decl. ¶ 14.)

## 1.    Percentage of the Fund

The Ninth Circuit has held that 25% of a common fund is the "benchmark" for a reasonable fee award, and courts must provide adequate explanation in the record of any "special circumstances" to justify a departure from this benchmark. *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 942–43 (9th Cir. 2011); *see In re Online DVD–Rental Antitrust Litig.*, 779 F.3d 934, 949 (9th Cir. 2015) ("Under the percentage-of-recovery method, the attorneys' fees equal some percentage of the common settlement fund; in this circuit, the benchmark percentage is 25%.").

Under the Settlement Agreement, Defendant agreed to pay a gross settlement amount of up to $575,000.00. (*See* Dkt. 27 [Notice of Motion and Motion for Settlement Approval of Class and Collective Settlement – Preliminary] at 3.) Courts within this Circuit have held that the attorneys' fee percentage should be calculated after deducting litigation and administration costs from the gross settlement amount, lest

counsel not only be reimbursed for the costs but also receive an additional 25% of those costs as a fee.  *See*, *e.g., In re Apple iPhone/iPad Warranty Litig.*, 40 F. Supp. 3d 1176, 1182 (N.D. Cal. 2014) (calculating a 25% fee from a net settlement fund after deducting administration costs); *Kmiec v. Powerwave Techs., Inc.*, 2016 WL 5938709, at *5 (C.D. Cal. July 11, 2016) (calculating attorneys' fee from net settlement award after deducting costs and administrative expenses); *Kanawi v. Bechtel Corp.*, 2011 WL 782244, at *3 (N.D. Cal. Mar. 1, 2011) (same).  Subtracting $9,500 in litigation costs and $16,500 in settlement administration costs from the $575,000 gross settlement amount yields a fund of $549,000.  The requested fee award of $117,783.71 amounts to only 21.4% of that fund, well below the presumptively reasonable 25% benchmark.  Further, no members of the Collective objected to the initial, higher fee request, which weighs in favor of finding that the new, lower fee request is reasonable.  *See Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 261 (N.D. Cal. 2015) ("The absence of objections or disapproval by class members to a 30 percent fee provides further support for the finding that the lower, 25 percent fee now requested is reasonable.")

### 2.    Lodestar Cross-Check

In cases where courts apply the percentage of the fund method to calculate attorneys' fees, courts are encouraged to use the lodestar method as a cross-check to evaluate the reasonableness of the percentage award.  *See Bluetooth*, 654 F.3d at 943–45; *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 (9th Cir. 2002).  In calculating an attorneys' fee award under this method, a court "must start by determining how many hours were reasonably expended on the litigation, and then multiply those hours by the prevailing local rate for an attorney of the skill required to perform the litigation." *Moreno v. City of Sacramento*, 534 F.3d 1106, 1111 (9th Cir. 2008) (citation omitted). The "relevant legal community" for the purposes of the lodestar calculation is generally

the forum in which the district court sits. *Gonzalez v. City of Maywood*, 729 F.3d 1196, 1205 (9th Cir. 2013).

Counsel claims that the lodestar value is $155,000. (*See* Dkt. 40 [Supplement to Notice of Motion and Motion for Settlement Approval, hereinafter "Fee Supp."] at 1.) In support of that valuation, Counsel has submitted supplemental briefing regarding its hours and rates, indicating that 204.5 attorney hours and 137.3 staff hours were spent in this action, for a total of 341.8 hours. (*See id.* at 2.) After reviewing Counsel's description of the tasks performed during the litigation and the number of hours spent on those tasks, the Court finds that the hours expended were reasonable.

The rates billed were $725 per hour for partner Matthew C. Helland (admitted to the Minnesota bar in 2004), $525 per hour for senior counsel Daniel Brome (admitted to California bar in 2011), and $195 per hour for non-lawyer staff (such as class action clerks, paralegals, and e-discovery support staff), and $225 per hour for a damages analyst. (*See id.* at 4.) These billing rates are reasonable and "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1994); *see Kendig v. ExxonMobil Oil Corp.,* 2020 WL 13302377, at *10 (C.D. Cal. Aug. 24, 2020) (approving hourly rate of $875 for partner and $450 for associate); *Dudley v. TrueCoverage LLC*, 2019 WL 3099661, at *6 (C.D. Cal. Mar. 22, 2019) (approving hourly rate of $750 for partner and $175 for paralegal); *Gant v. Aldi, Inc.*, 2021 WL 3472835, at *16 (C.D. Cal. Jan. 26, 2021) (approving hourly rate for senior associate of $500); *Pike v. Cnty. of San Bernardino*, 2020 WL 1049912, at *4 (C.D. Cal. Jan. 27, 2020) (approving hourly rate of $650 for attorney with seventeen years' experience and $900 for attorney with thirty-five years' experience).

//

//

While Courts have discretion to approve a lodestar multiplier, the requested fees are "considerably lower" than the lodestar value—Counsel claims a lodestar of $155,000, but only seeks $117,783.71 in fees.  (*See* Fee Supp. at 1.)  This further supports a finding that the requested fees are reasonable.  *See Goodwin v. Citywide Home Loans, Inc.*, 2015 WL 12868143, at *4 (C.D. Cal. Nov. 2, 2015) (fact that requested fees were lower than the lodestar value and no collective members objected suggested reasonableness).

Because Counsel's requested fees are reasonable under both the percentage of the fund method and the lodestar cross-check, the Court will grant Counsel's request and award attorneys' fees of $117,781.71.

### D.    Litigation Costs

Counsel requests approval of $9,500 in out-of-pocket litigation costs.  (*See* Brome Decl. ¶ 10.)  "[A]ttorneys may recover their reasonable expenses that would typically be billed to paying clients in non-contingency matters."  *Cunha v. Hansen Nat. Corp.*, 2015 WL 12697627, at *5 (C.D. Cal. Jan. 29, 2015) (awarding $318,207 in costs).  Counsel asserts that it "has incurred unreimbursed costs during this litigation, which it advanced on behalf of Plaintiffs" and that it "will incur additional costs in finalizing and administering the settlement."  (Brome Decl. ¶ 10.)  To date, Counsel "has incurred $9,579.41 in costs, exceeding the amount requested," and "[m]ore than two thirds of these costs ($6,510.00) are for mediation; the remainder consist of reasonable charges for filing fees, postage, case advertising, discovery storage, and legal research."  (*Id.*; *see also id.* Ex. A [itemized record of Counsel's costs].)

//

//

//

//

### E.   Settlement Administration Costs

The Settlement Agreement provides for the payment of "Administration Costs," made up of "the actual and direct costs reasonably charged by the Settlement Administrator, CPT Group, for its services in administering the Settlement."  (SA ¶ 2.)  Plaintiff now requests approval of $16,500.00 in settlement administration costs.  (*See* Garcia Decl. ¶ 16.).  As the Settlement Administrator, CPT is responsible for (a) printing, mailing, and emailing initial and reminder notices to the Collective Members, and conducting skip tracing as necessary, (b) calculating and distributing the individual settlement payments, (c) preparing and transmitting necessary tax documentation and filings, and (d) providing necessary reports and declarations.  (*See id.* ¶ 2.)  In light of these duties and the important role CPT has played in facilitating the settlement, the Court finds that $16,500 in settlement administration fees is reasonable.

### F.   Incentive Award

"At its discretion, a district court may award an incentive payment to the named plaintiffs in a FLSA collective action to compensate them for work done on behalf of the class."  *Selk*, 159 F. Supp. 3d at 1181.  In determining whether an incentive award is appropriate, courts consider "the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation."  *Id.*  Incentive awards typically range from $2,000 to $10,000.  *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 267 (N.D. Cal. 2015) (collecting cases); *see In re Toys R Us-Del., Inc.-Fair & Accurate Credit Transactions Act Litig.*, 295 F.R.D. 438, 470 (C.D. Cal. 2014) (explaining that California district courts typically approve incentive awards between $3,000 and $5,000).  A $5,000 payment is "presumptively reasonable."  *Bellinghausen*, 306 F.R.D. at 266.

Plaintiff requests the Court's approval of an incentive payment of $7,500 to the Named Plaintiff, asserting that a $7,500 award is appropriate because the Named Plaintiff risked professional retaliation for her participation and "invested time and effort into" assisting Counsel with the case. (*See* Mot. at 12–13.) Although the precise amount of time and effort Plaintiff expended advancing the litigation is not clear, it is apparent that the Collective benefitted from Plaintiff's decision to file suit and pursue this action. In agreeing to file suit, Plaintiff assumed the risk of having a judgment entered against her in the event she did not prevail, and likewise faced possible repercussions from being publicly identified as having sued her employer. The Court is persuaded that the evidence justifies awarding Plaintiff an incentive award slightly higher than the "presumptively reasonable" amount of $5,000. *See Hernandez v. Dutton Ranch Corp.*, 2021 WL 5053476, at *7 (N.D. Cal. Sept. 10, 2021) (finding requested service awards of $7,000 to be reasonable); *see also Sandoval v. Tharaldson Emp. Mgmt., Inc.*, 2010 WL 2486346, at *10 (C.D. Cal. June 15, 2010) (awarding $7,500). Accordingly, the Court will approve a $7,500 incentive award for Plaintiff.

## V.    PAGA SETTLEMENT

Under PAGA, an "aggrieved employee" may bring an action for civil penalties for labor code violations on behalf of herself and other current or former employees. Cal. Lab. Code § 2699(a). A plaintiff suing under PAGA "does so as the proxy or agent of the state's labor law enforcement agencies." *Arias v. Superior Court*, 46 Cal. 4th 969, 986 (2009). A judgment in a PAGA action "binds all those, including nonparty aggrieved employees, who would be bound by a judgment in an action brought by the government." *Id.* Although there is no binding authority setting forth the proper standard of review for PAGA settlements, California courts often look to the LWDA's guidance that relief "be genuine and meaningful, consistent with the underlying purpose of the statute to benefit

the public." *O'Connor v. Uber Techs., Inc.*, 201 F. Supp. 3d 1110, 1133 (N.D. Cal. 2016) (citing the LWDA's guidance with approval).

The parties have agreed that Defendant will pay a PAGA penalty of $4,000.  (*See* Mot. at 21.)  Seventy-five percent ($3,000) will go to the LWDA, and twenty-five percent ($1,000) will remain part of the settlement for distribution to eligible Collective Members.  *See id.*; *see also* Cal. Lab. Code § 2699(i) (providing that 75% of civil penalties recovered by aggrieved employees should be distributed to the LWDA).  The $4,000 PAGA allocation represents 4.7% of the estimated value of the PAGA claims and 0.7% of the gross settlement value.  (*See* Brome Decl. ¶ 7).

The Settlement Agreement's PAGA allocation is comparable to other settlements approved by district courts in this Circuit and is a minimal but acceptable amount to vindicate the LWDA's interest in enforcing California's labor laws.  *See Smith v. Kaiser Found. Hosps.*, 2020 WL 5064282, at *17 (S.D. Cal. Aug. 26, 2020) (finding that PAGA award that was 2.4% of maximum estimated value of PAGA claims was not "unfair, inadequate, or unreasonable given the risks of continued litigation"); *Gilmore v. McMillan-Hendryx Inc.*, 2022 WL 184004, at *4 (E.D. Cal. Jan. 20, 2022) (PAGA award of 4.2% of the maximum estimated value of PAGA claims and 2.3% of the total settlement amount was "not unreasonable and weighs in favor of settlement"); *Merante v. Am. Inst. for Foreign Study, Inc.*, 2022 WL 2918896, at *6 (N.D. Cal. July 25, 2022) (PAGA award of between 0.27% and 2% of the maximum estimated value of PAGA claims was "small" but "within the range of reasonableness").  This is especially true given the fact that only a small number of the Collective Members worked in California and thus were eligible to seek penalties under PAGA.  Finally, The LWDA has also "received notice of the Settlement, and has not taken action to intervene."  (Mot. at 13.)

//

//

# VI.  CONCLUSION

For the foregoing reasons, Plaintiff's motion for final settlement approval is **GRANTED**.  Plaintiffs shall submit a proposed judgment within **seven (7) days** of this Order.

DATED:     April 3, 2023

CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE